UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENISE HEARN,

     Plaintiff,        Case No. 11-15221
                 Honorable David M. Lawson

v.

COUNTY OF WAYNE and DEBORAH BLAIR,

     Defendants.
_____/

### OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

   Plaintiff Denise Hearn filed a complaint, later amended, alleging that she was terminated wrongfully from her job as a clerical worker for the County of Wayne, Michigan, and that she was defamed by defendant Deborah Blair, a county attorney in the labor relations department. The complaint includes claims of age and race discrimination and retaliation in violation of federal and state law, hostile work environment, termination in violation of public policy, and slander. After a period of discovery, the defendant moved for summary judgment. The Court heard oral argument on February 14, 2013 and now concludes that the plaintiff has not tendered proof sufficient to establish a genuine issue of material fact on all the essential elements of her claims, and the defendants are entitled to judgment in their favor as a matter of law. Therefore, the Court will grant the motion for summary judgment and dismiss the complaint.

I.

   The plaintiff was hired as a Wayne County employee in 1991 and served in various positions over the years, most recently as an Account Clerk II. She was a member of Local 1659 of the American Federation of State, County, and Municipal Employees union (AFSME), and became a

union steward in August 2010. Her employment came to an end on June 27, 2012 when she did not return to work after an extended leave of absence. The defendants maintain that the plaintiff voluntarily quit her job, and the plaintiff contends that she was fired. The plaintiff applied for worker's compensation and duty disability retirement benefits.

The plaintiff alleges that the County fired her because of her age and her race, and retaliated against her because she was a union representative and she had filed a complaint against a coworker for creating a sexually hostile work environment. In addition, the plaintiff alleges that during a clarification meeting December 8, 2010 concerning the plaintiff's work duties, a County labor relations staff attorney, defendant Deborah Blair, made remarks in the hearing of two persons about the plaintiff that were not true.

The events that gave rise to this lawsuit appear to have begun in 2009. The plaintiff had transferred to the accounts payable division. On December 2, 2009, the plaintiff filed a sexual harassment complaint against a coworker who, she said, displayed a screen saver on his computer monitor with photographs of "male friend dressed as a female." She also said that the coworker had discussed this male friend visiting him at Thanksgiving. The plaintiff also stated that she had observed the coworker looking at her when she was in her stocking feet and that she believed the coworker had a foot fetish, which made her uncomfortable. At oral argument, plaintiff's counsel asserted that the coworker took photographs of the plaintiff walking in the office in her stocking feet, but the record is utterly devoid of any factual support for that assertion.

The plaintiff did testify that she was uncomfortable with sitting near this coworker. She sent an email regarding the same coworker to Elois Lynch, the plaintiff's department manager, on May 26, 2010, complaining that the coworker's pants were off his hips, "where you could see the entire

-2-

band of his BVD's and the entire back of his buttocks were exposed.  (You could see very detailed areas of his buttocks.)"  The plaintiff also stated that the coworker's pubic hair was exposed and that he passed gas frequently.  Ms. Lynch responded that the plaintiff could move her seat.

According to the plaintiff, she filed three complaints because the coworker's behavior was escalating.  The plaintiff says that her supervisor, Greta Johnson, brought in underwear for the coworker after the plaintiff complained about his exposed buttocks.  However, the plaintiff was told that the coworker was permitted to keep the screen saver, which Ms. Lynch believed was a picture of a woman and that it was a family picture.  Ms. Lynch also testified that the coworker was asked to cover up and that he started wearing belts.  The plaintiff points to her complaints as one instance of protected conduct that she believes provoked retaliation by Wayne County.

The plaintiff also alleges that at some point (it is not clear when), Ms. Lynch made three age-related comments.  Ms. Lynch allegedly said that the plaintiff was slow because she was old, that the plaintiff looked younger than Ms. Lynch even though the plaintiff had more grey hair, and that the plaintiff was the oldest person on the floor.  The plaintiff thinks that at least one of these comments may have been made in December 2010.  She did not lodge complaints about those comments; Ms. Lynch denies making them.  However, the plaintiff believes the comments are either direct or circumstantial evidence of age discrimination.

In August 2010, the plaintiff became a steward for AFSCME.  Beginning in September 2010, the plaintiff submitted a series of requests for union business leave.  According to Jenilyn Norman, requests for union leave were approved unless there was a pressing need for workers in the department or granting the request would result in leaving the office short-staffed.  The plaintiff's September 14, 2010 request for leave to complete union business was denied because the plaintiff

would not be able to complete her work; the denial indicated that time off would be approved when the plaintiff's workload was complete.  The plaintiff's request for union business leave dated September 24, 2010 was approved.  The requests for leave on October 4, 5, and 6, 2010 were denied for the stated reason that it was a critical year-end processing week and the plaintiff was needed in the office until the year-end closing date of October 7, 2010.  The plaintiff's request forms always included a note that they were "sign[ed] under protest; not able to perform sworn union steward obligations," even if the request were granted.  The plaintiff's requests for leave on October 8 and 22, 2010 and November 10 and 12, 2010 were approved.

On October 22, 2010, the plaintiff was given a written reprimand with an effective date of October 20, 2010, because the plaintiff refused to make copies of checks when directed by a superior.  Apparently, the checks were on the desk of a coworker — a Caucasian woman — and the plaintiff protested having to make the copies herself when the other employee could do the task. The plaintiff filed a grievance arguing that the reprimand was punitive, a violation of the collective bargaining agreement, and without just cause.  According to the plaintiff, it was not her job to copy the checks.  Plaintiff's counsel explained at oral argument that the reprimand was the sole instance of adverse action that supports the Title VII race discrimination claim.  She says that is one instance that supports the ADEA claim as well.

Also on October 20, 2010, the plaintiff was subpoenaed to appear before the State Office of Administrative Hearings and Rules on October 25, 27, and 29, 2010 to testify in connection with her union steward duties.  The plaintiff testified at deposition that she was told by Jenilyn Norman, another supervisor, that if she left work to comply with the subpoena she would be jeopardizing her job, that she was not to leave, and that if she did she would be leaving her job unprotected.

However, the plaintiff was able to leave work to testify.  The plaintiff testified that the day after she finished testifying, Ms. Norman accused her of stealing time by inaccurately reporting her arrival time.  However, the plaintiff stated that she had reported her check-in time inaccurately by mistake, she previously had informed her manager, Eloise Lynch, that she had forgotten her password for the time clock system, and therefore she had been unable to fix her time.  The plaintiff testified that Ms. Norman tore up a written reprimand that she had prepared and stated "then just let it go and just pay more attention to getting your time in."  Ms. Norman denies the plaintiff's allegations.  The plaintiff contends that Norman's criticism for attending the administrative hearing and reporting time incorrectly amount to additional adverse action that supports her AEDA claim.

On November 15, 2010, the plaintiff sent an email stating that she had to leave work on official union business.  Apparently, the plaintiff visited a law office to review some documents that were requested through a subpoena.

On December 8, 2010, county and union representatives attended a meeting designated as a "special conference" to discuss whether job obligations of the workers included carrying county checks between various office buildings in the City-County complex.  In attendance were the plainitiff, Lenora Davis, and Tin Turner on behalf of the union and defendant Deborah Blair, Jenilyn Norman, and Arif Rasheed on behalf of Wayne County.  During the meeting, the county representatives separated to caucus among themselves.  Somehow the union representative was able to record the private caucus — the defendant speculates that one of the union people left an active cell phone in the area — and heard Deborah Blair make derogatory remarks about the plaintiff.  The plaintiff became aware of these comments because Tina Turner emailed the recording to her.  According to the plaintiff, Blair stated that she "wouldn't trust [the plaintiff] as far as [she] could

-5-

throw her"; that she thought if the plaintiff were entrusted with the checks, she would go to the casino and "goof off," take the checks, throw them away, and say that someone robbed her; and that the plaintiff lied about being related to Tommy Hearns and her daughter's foreign study program.

Defendant Blair testified that she used the casino as an example of a "frolic and detour" that the plaintiff might be distracted by rather than attending to her duties because the casino was near the treasurer's office. She said that her comments about flushing checks down the toilet and saying they were stolen referred to Tina Turner rather than the plaintiff. Blair admitted that she stated that the plaintiff claimed to be related to Tommy Hearns when she was not and that the plaintiff claimed that her daughter was studying abroad when she was not. Blair stated that she used those as examples of the plaintiff "not being accurate in her representations." Blair stated that those examples were relayed to her by someone she believed to be truthful, but conceded that she did not know for a fact whether they were true. Defendant Blair also conceded that she had never known the plaintiff to go to the casino, to flush checks down the toilet, or to lie about checks being stolen. Two other individuals, department director Jenilyn Norman and deputy director Arif Rasheed, were present when defendant Blair made the comments. Those comments form the basis of the defamation count.

On December 10, 2010, the plaintiff's request for union leave for "legal review" was denied for the stated reason that the plaintiff was the only staff person in the office and work was behind. The denial also states that the steward "may investigate reported grievances within designated area only." On the same day, the plaintiff stated that she was sick and would sign out for the day. EMS was called and the plaintiff left with them. The plaintiff called in sick between December 13 and 23, 2010, between January 5 and 12, 2011 and on January 14, 2011.

On January 18, 2011, the plaintiff came to a meeting to discuss the October 22, 2010 reprimand and the resulting grievance; the meeting was called as Step 4 of the grievance procedure outlined in the collective bargaining agreement.  The plaintiff was on FMLA leave at the time.  The plaintiff, Joyce Ivory, and Joyce Wright attended on behalf of the union, and Blair, Jenilyn Norman, and Dinah Tolbert on behalf of defendant Wayne County.  Ivory refused to proceed with the meeting because of the derogatory comments that Blair previously had made about the plaintiff.

On that same day, the plaintiff filed a charge of age and race discrimination with the Michigan Department of Civil Rights and the EEOC.  The charge included Blair as a respondent. Blair, with human resources, normally investigated such matters for the county, but because of the conflict, Cheryl Yapo of the Department of Corporation Counsel sent the plaintiff a letter stating that she had been assigned to investigate the EEOC charge and requested that the plaintiff contact her to arrange a meeting.  The February 7, 2011 letter states that if the plaintiff did not respond by February 14, 2011, Yapo would assume that the plaintiff did not wish to pursue the matter.  Yapo sent the plaintiff a second letter on February 15, 2011 stating that she assumed that the plaintiff was not interested in meeting with her as she had not received a response from the plaintiff.  On the same day, Yapo sent the plaintiff an email attaching the letter and stating that if the plaintiff was interested in pursuing the EEOC charge she should contact Yapo.  The plaintiff contends that Yapo's contacts with her while on medical leave amounted to harassment and constituted retaliation for her protected conduct.

Blair testified that when she was the EEO coordinator, she would wait until a charging party returned from medical leave to conduct the investigation.  Precious Walton also testified that if a charging party were on medical leave, she would contact the party to determine the nature of the

leave and then wait until the party returned from leave to continue the investigation. Yapo stated that it was her general practice to contact charging parties at home. Yapo conceded that it would be inappropriate to contact a charging party who was on an approved medical leave of absence and had a restriction from returning to work, but stated that she had not received a medical restriction prohibiting the plaintiff from speaking with her. Yapo testified that she included the language about assuming the plaintiff did not wish to pursue the matter to motivate the plaintiff to contact her.

Yapo also sought to interview Lenora Davis and Tina Turner as part of her investigation into the plaintiff's EEOC charge. On February 10, 2011, Joyce Ivory sent Yapo an email stating that those individuals would not be interviewed without legal counsel present. Yapo responded that she had received approval from those individuals' supervisors to interview them on February 15, 2011, but that they were not entitled to legal or union representation. The interviews did not take place. On February 18, 2011, Alina Watkins, a staff attorney with the union, sent Yapo an email telling Yapo to cease and desist from contacting the plaintiff and the union. Yapo responded that the purpose of the interview was not disciplinary, that the individuals were not entitled to counsel, and that she would contact the EEOC to inform them that the union had made fact witnesses unavailable.

Deborah Blair testified that when she was the EEO coordinator, she would usually permit witnesses to have a union steward or representative present. Walton testified that she usually informed witnesses that they did not need to bring anyone else to the interview, but that some individuals had brought union stewards. However, in Walton's experience, no one had ever brought legal representation to an interview. Yapo testified that she had refused to conduct the interviews with representation present because it would "set a precedent that under any circumstances the union

can be present.  Even though the contract doesn't allow for it, there's no law that says I have to do it, and I myself didn't see that it was a disciplinary matter for any of the witnesses."

On March 11, 2011, Yapo sent the EEOC a letter outlining defendant Wayne County's position statement in response to the plaintiff's charge.  The plaintiff was issued a right-to-sue letter on August 30, 2011.  She commenced this lawsuit on November 28, 2011.

Meanwhile, on December 27, 2010, the plaintiff requested a leave of absence under the FMLA to begin on December 11, 2010 and end on January 3, 2011.  The plaintiff then applied several times to extend her leave; the plaintiff's unpaid leave was extended to June 26, 2012.  The plaintiff was no longer eligible for FMLA leave but her requests were approved under a provision of the collective bargaining agreement.  The plaintiff also applied for worker's disability compensation payments and sought a duty disability retirement.  On June 26, 2012, the plaintiff's leave eligibility was exhausted.  The plaintiff was terminated from employment on June 27, 2012 because she failed to return from her contractual leave.  Wayne County classified the termination as a "voluntary quit" under the collective bargaining agreement.  The plaintiff's application for worker's compensation and duty disability retirement remained pending.  However, counsel for the County stated at oral argument that the plaintiff recently had been granted a non-duty disability retirement, which provided her with about half the monthly benefits she would have received under a duty disability retirement.

The plaintiff's amended complaint states claims for race discrimination under Title VII (count I); age discrimination under the ADEA (count II); retaliation in violation of Title VII, the ADEA, and the Elliott-Larsen Civil Rights Act (counts III and V); hostile work environment sexual harassment in violation of the Elliott-Larsen Act (count IV); violation of public policy under

Michigan common law (count VI); and defamation (count VII). The defendants have moved for summary judgment on all counts of the amended complaint.

II.

The defendants rely on both Federal Rule of Civil Procedure 12(b)(6) and Rule 56 in their motions. At oral argument, the defendants acknowledged that a Rule 12 motion is not timely and chose to rely solely on Rule 56.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Sixth Circuit has explained:

> Both claimants and parties defending against a claim may move for summary judgment "with or without supporting affidavits." Fed. R. Civ. P. 56(a), (b). Such a motion presumes the absence of a genuine issue of material fact for trial. The court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

*Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009).

"The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Id*. at 558. (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid*. (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

-10-

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted).   A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.   If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).   "Thus, the mere existence of a scintilla of evidence in support of the [opposing party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Highland Capital*, 350 F.3d at 546 (quoting *Anderson*, 477 U.S. at 252) (quotations omitted).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000).   A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001).   "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000).   An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248).

In a defensive motion for summary judgment, the party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000).   Failure to prove an essential element of a claim renders all other facts immaterial for

-11-

summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

### A. Race and Age Discrimination

The plaintiff accuses defendant Wayne County of race discrimination under Title VII of the Civil Rights Act of 1964 and age discrimination under the Age Discrimination in Employment Act (ADEA). She contends that the October 2010 written reprimand amounted to adverse action by her employer and it was motivated by her race. She says that the written reprimand, the criticism for attending administrative hearings to which she was subpoenaed, and the torn-up reprimand for mis-accounting for her clock start time were adverse actions motivated by her age. The defendant argues that these claims fail for want of proof. The Court agrees.

To prove race discrimination under Title VII, the plaintiff must offer evidence that the defendant took adverse action against her and that race was a motivating factor. *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012). To prove age discrimination under the ADEA, the plaintiff must offer evidence that the employer's adverse action would not have been taken against her but for her age. *Blizzard v. Marion Technical College*, 698 F.3d 275, 283 (6th Cir. 2012) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)). These elements may be established by direct or circumstantial evidence. *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003); *see also Geiger v. Tower Automotive*, 579 F.3d 614, 620 (6th Cir. 2009).

The plaintiff does not present any direct evidence of race discrimination. However, she does argue that she has offered at least some potential direct evidence of age discrimination in the form of Elois Lynch's several age-related remarks. The plaintiff also argues, without pointing to any evidence, that Lynch was the decision maker or assisted Jenilyn Norman in making employment

decisions about the plaintiff.  "Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful [discrimination] was a motivating factor in the employer's action." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543-44 (6th Cir. 2008). "'Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.'" *In re Rodriguez*, 487 F.3d 1001, 1007 (6th Cir. 2007) (quoting *Johnson*, 319 F.3d at 865).  Direct evidence is a manifestation of actual discriminatory intent by a decision maker, "such as an explicit statement" that the employer was acting on the basis of a protected status.  *Imwalle*, 515 F.3d at 544.  "Evidence of discrimination is not considered direct evidence unless a[n improper] motivation is explicitly expressed." *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006).

Ms. Lynch's remarks fall far short of the mark as direct evidence of age animus.  Her remarks were not connected structurally or temporally to any of the adverse action on which the plaintiff relies. *See DiCarlo v. Potter*, 358 F.3d 408, 417-18 (6th Cir. 2004).  Moreover, the plaintiff has not demonstrated that Lynch had any involvement in any adverse employment action directed at the plaintiff beyond a bare assertion that Lynch was a decision maker or Norman's "Cat's Paw." Such conclusory assertions are insufficient to defeat a motion for summary judgment.

In the absence of direct evidence, the plaintiff might prevail if she can establish an inferential case of discrimination.  To do so, the plaintiff must proceed under the "the burden-shifting framework first set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 802-05 (1973)." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007) (citations omitted).  That construct requires the plaintiff to present a *prima facie* case, whereupon the defendant must offer a legitimate reason

-13-

for its actions.  If the defendant does so, the plaintiff cannot proceed unless she offers some evidence that the defendant's proffered justification is a pretext for unlawful discrimination.  *See Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 342 (6th Cir. 1997).  Unlike race discrimination, to prevail on a disparate-treatment claim under the ADEA, "a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision."  *Gross*, 557 U.S. at 176 (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008), and *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63-64 & n.14 (2007)).  The Sixth Circuit has held, however, that the application of the *McDonnell Douglas* framework to determine whether the plaintiff has offered sufficient circumstantial proof of illegal motive at the summary judgment stage remains unaffected by *Gross*.  *Geiger*, 579 F.3d at 622.

A plaintiff may establish a *prima facie* case of discrimination "by showing that: (1) she is a member of a protected group, (2) she was subject to an adverse employment decision, (3) she was qualified for the position, and (4) she was . . . treated differently than similarly situated non-protected employees."  *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (internal citations omitted).

The plaintiff has demonstrated the first element of a *prima facie* case of race and age discrimination.  The plaintiff is African-American, and at fifty-four years of age, the plaintiff falls within the intended scope of protection of the ADEA.  *See* 29 U.S.C. § 631(a) ("The prohibitions in this chapter shall be limited to individuals who are at least 40 years of age.").   The second element is in doubt.  "An adverse employment action is an action by the employer that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008) (quoting *Burlington Indus. v.*

-14-

*Ellerth*, 524 U.S. 742, 761 (1998)).  The plaintiff does not allege that her termination was motivated by race or age animus.  Instead, she points to the written reprimand and other criticisms, remarks and accusations by supervisors that did not result in discipline.  Those actions do not fit *Burlington Industry*'s definition of adverse action, inasmuch as they did not result in *any* change in employment status.

Moreover, the plaintiff has not presented any evidence that she was treated differently than another employee outside the protected class.  She offers no comparators on her age claim, and the only employee she cites as having been treated differently on the race claim is the white woman on whose desk were the checks the plaintiff was told to copy.  The plaintiff was written up for insubordination when she refused to do so, but there is no evidence that the other employee was told to copy the checks and refused, or that she was even present at the time.  "To satisfy the similarly-situated requirement, a plaintiff must demonstrate that the comparable employee is similar 'in all of the *relevant* aspects.'"  *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (emphasis in original)); *see also McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005) ("The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated.'" (citation omitted)).  To be "similarly situated," employees generally must "have dealt with the same supervisor" and "have been subject to the same standards."  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). There is no evidence that approaches that requirement in this record.

Because the plaintiff has not presented a *prima facie* case of race or age discrimination, her Title VII and ADEA claims fail.

-15-

B.  Retaliation

The plaintiff asserts that Wayne County disciplined her, harassed her while on medical leave, failed to investigate her EEOC charge, fought her worker's compensation claim, delayed her request for duty disability retirement, and terminated her, all in retaliation for making an internal complaint about the sexual harassment of a coworker, filing an EEOC charge, and commencing this lawsuit. The defendants argue that county attorney Cheryl Yapo's investigation into the plaintiff's EEOC charge does not constitute harassment, and that any other contact with the plaintiff was instigated by the plaintiff's union representatives.  The defendants also argue that there was no causal connection between the plaintiff's protected activity and an adverse employment action.

Title VII, the ADEA, and the Elliott-Larsen Act prohibit retaliation against an employee for complaining about discrimination.  *See* 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."); 29 U.S.C. § 623(d) ("It shall be unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any matter in an investigation, proceeding, or litigation under this chapter."); Mich. Comp. Laws § 37.2701(a) (making it unlawful to "[r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act.").  The Sixth Circuit has stated that "Title VII's anti-retaliation provision is similar in

-16-

relevant respects to the ADEA's anti-retaliation provision, and that it is therefore appropriate to look to cases construing Title VII as a source of authority for interpreting the ADEA's anti-retaliation clause." *Fox v. Eagle Distributing Co.*, *Inc.*, 510 F.3d 587, 591 (6th Cir. 2007).  For analytical purposes, Michigan's Elliott-Larsen Act resembles federal law, and the same evidentiary burdens prevail as in Title VII cases.  *See In re Rodriguez*, 487 F.3d at 1008; *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004); *Lytle v. Malady*, 458 Mich. 153, 172-73, 579 N.W.2d 906, 914-15 (1998).

A plaintiff establishes a *prima facie* case of retaliation by offering evidence that (1) she engaged in protected activity; "(2) the exercise of [her] civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action."  *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).  Protected activity "covers conduct such as 'complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices . . . .'"  *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir. 2008) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000)); *see also Fox*, 510 F.3d at 591-92 (requiring the substance of the complaint to management be that an employee was "discriminated against on the basis of his [protected status]") (interpreting ADEA), *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1313 (6th Cir. 1989) (holding that an employee must do more than make a "vague charge of discrimination," and that an employee who sent a letter complaining that charges against him were the product of "ethnocentrism" did not engage in protected activity under Title VII).  The plaintiff's complaints about her coworker, her EEOC complaint, and the present lawsuit constitute protected activity.

-17-

It is plain that the defendant knew about that activity. In addition, the plaintiff's termination certainly was adverse action. *Vincent v. Brewer Co.*, 514 F.3d 489, 495 (6th Cir. 2007). In addition, refusing worker's compensation benefits and delaying her request for duty disability retirement benefits likely fit the definition of adverse action as well, see *Burlington Indus.*, 524 U.S. at 761, although there is some doubt about whether Cheryl Yapo's conduct can be characterized properly as harassing the plaintiff on medical leave or failure to investigate her EEOC charge. Nor does it fit the definition of adverse action, since it had no effect on her employment status. *White*, 533 F.3d at 402. Nonetheless, the plaintiff has offered some evidence on the first three elements of a *prima facie* case of retaliation.

Her proof of causation, however, is wanting. The plaintiff has offered no evidence connecting the adverse action to her protected activity except that one (the adverse action) came after the other (the protected activity). There is no other link in this record.

Certainly, temporal proximity sometimes can satisfy the standard at the summary judgment stage. But the proximity of one to the other must be "very close in time." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). "[W]here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Ibid.* (citing *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 365 (6th Cir. 2001)).

The plaintiff was terminated more than thirty months after filing her sexual harassment complaint on December 2, 2009, seventeen months after filing her EEOC charge on January 18, 2011, and about seven months after filing this lawsuit. This time gap precludes a finding of a causal connection based on temporal proximity alone, and the plaintiff has presented no other evidence

-18-

suggesting a causal connection between her termination and her protected activity. *See Dixon v. Gonzales*, 481 F.3d 324, 334 (6th Cir. 2007) ("[T]his Court has typically found the causal connection element satisfied only where the adverse employment action occurred within a matter of months, or less, of the protected activity."). The plaintiff had not been at work regularly since December 10, 2010 and had been on a leave of absence since January 18, 2011. The plaintiff argues that she was not given eighteen full months of medical leave, as she worked two days in January. Although it appears that the plaintiff was terminated prior to exhausting eighteen full months of leave, the collective bargaining agreement that governs medical leave without pay provides that all extensions of medical leave beyond six months are "at the discretion of the Director of Personnel/Human Resources." Defs.' Mot. for Summ. J. Ex. 3 at 53. The plaintiff therefore was not deprived of additional medical leave to which she was unequivocally entitled, and the plaintiff has not demonstrated that the decision to end the plaintiff's leave on June 26, 2012 rather than July 18, 2012 was causally connected to her protected activity. The plaintiff also argues that she should not have been terminated before her worker's compensation and duty disability retirement claims were processed, but presents no evidence to suggest that those claims have not been processed as retaliation for her protected activity beyond a conclusory assertion.

The plaintiff has not presented a *prima facie* case of retaliation. Therefore, the Court will grant the defendants' motion for summary judgment on the plaintiff's retaliation claims.

## C. Sexual harassment

The plaintiff contends that she was subjected to a sexually hostile work environment because a fellow employee wore pants that exposed his buttocks and pubic hair, had photographs of a man dressed as a woman on his screen saver, and had a foot fetish. The plaintiff points out that she

-19-

complained repeatedly regarding this coworker, but that nothing was done until she shouted that either the coworker had to leave or she would leave; the only solution offered was that the co-worker was provided with new underwear and told to start wearing a belt.

Michigan's Elliott Larsen Civil Rights Act (ELCRA) prohibits employers from discriminating against an employee based on sex includes sexual harassment. Mich. Comp. Laws § 37.2103(i).

> "[S]exual harassment" is specifically defined to include "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions:
>
> (i) Submission to the conduct or communication is made a term or condition either explicitly or implicitly to obtain employment . . . .
>
> (ii) Submission to or rejection of the conduct or communication by an individual is used as a factor in decisions affecting the individual's employment . . . .
>
> (iii) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment . . . ."

*Chambers v. Trettco, Inc.*, 463 Mich. 297, 309-10, 614 N.W.2d 910, 915 (2000) (quoting Mich. Comp. Laws § 37.2103(i)(i)-(iii)). The plaintiff's complaint focuses on the third component of this definition, since the plaintiff has not alleged that submission to sexual conduct or communication was made a condition of her employment or used as a factor in decisions regarding her employment.

The Michigan Supreme Court has held that "actionable sexual harassment requires conduct or communication that *inherently* pertains to sex." *Corley v. Detroit Bd. of Educ.*, 470 Mich. 274, 279, 681 N.W.2d 342, 345 (2004); *see Haynie v. Michigan*, 468 Mich. 302, 312, 664 N.W.2d 129, 135 (2003). The plaintiff need not prove that the harasser's conduct or communication arose from a sexual desire for the plaintiff. *Robinson v. Ford Motor Co.*, 277 Mich. App. 146, 155, 744 N.W.2d 363, 368 (2007).

-20-

Under Michigan law, sexual harassment that substantially interferes with an individual's employment is referred to as hostile work environment harassment. *Radtke v. Everett*, 442 Mich. 368, 381, 501 N.W.2d 155, 161 (1993). In order to establish a claim of hostile environment harassment, an employee must prove the following elements:

> (1) the employee belonged to a protected group;
> (2) the employee was subjected to communication or conduct on the basis of sex;
> (3) the employee was subjected to unwelcome sexual conduct or communication;
> (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and
> (5) respondeat superior.

*Id*. at 382-83, 501 N.W.2d at 162. There must be proof that "the work environment is so tainted by harassment that a reasonable person would have understood that the defendant's conduct or communication had either the purpose or effect of substantially interfering with the plaintiff's employment, or subjecting the plaintiff to an intimidating, hostile, or offensive work environment." *Id.* at 398, 501 N.W.2d at 169. This objective test is based on all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Quinto v. Cross & Peters Co.*, 451 Mich. 358, 370 n. 9, 547 N.W.2d 314, 320 n. 9 (1996) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). But "[i]t is only when the workplace is 'permeated' with discriminatory intimidation, ridicule and insult that the Civil Rights laws are implicated." *Schemansky v. California Pizza Kitchen, Inc.*, 122 F. Supp. 2d 761, 777 (E.D. Mich. 2000) (citing *Harris*, 510 U.S. at 21).

The evidence falls well short of the pervasiveness and permeation required by Michigan law; the plaintiff has not offered proof of a sexually hostile work environment. First, the plaintiff

-21-

complained that she had seen the coworker looking at her feet. The plaintiff stated that the coworker had also looked at other employee's feet and that other employees believed that the coworker had a foot fetish. It appears that the belief that the coworker had a foot fetish arose solely from the coworker looking at other employee's feet, rather than any communication by the coworker to that effect. The plaintiff has not presented any case law suggesting that looking at a person's feet is conduct that "inherently pertains to sex" for the purposes of the statute. *Corley*, 470 Mich. at 279, 681 N.W.2d at 345. Moreover, although the plaintiff may have found it unsettling to have a coworker look at her feet, the Michigan Supreme Court has stated that "whether a hostile work environment existed shall be determined by whether a reasonable person, in the totality of the circumstances, would have perceived the conduct at issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating intimidating, hostile, or offensive work environment." *Radtke*, 442 Mich. at 394, 501 N.W.2d at 167. The Court is not convinced that the few instances in which the coworker reportedly looked at the plaintiff's feet is sufficient to create a hostile work environment under this standard.

The plaintiff's second complaint relates to a screen saver on the coworker's computer. A photograph of a man wearing women's clothing does not constitute a communication that "inherently pertains to sex." *Corley*, 470 Mich. at 279, 681 N.W.2d at 345. Undoubtedly, it is possible that a photograph of a man dressed as a woman *could* be sexual in nature; for example, the photograph could be posed in a provocative manner or the individual in the photograph could be wearing revealing clothing. But the plaintiff has not described the screen saver in that manner. An assertion that the coworker had a photo of a man dressed as a woman, without more, does not demonstrate that the photograph was sexual in nature. The plaintiff characterizes the photograph

-22-

as "sexually explicit" but does not provide any information as to what was explicit about the photograph beyond the fact that it depicted an individual that the plaintiff believed to be male wearing female clothing.  The Court cannot conclude on this basis that the coworker's screen saver was communication of a sexual nature, and it did not amount to the pervasiveness that characterizes a hostile environment.

The plaintiff's third and final complaint about her coworker was that his pants hung low and exposed his buttocks and pubic hairs.  According to the plaintiff, the defendant's remedial measures consisted of her supervisor furnishing underwear for the coworker after the plaintiff complained about his exposed buttocks, permitting the plaintiff to move her desk away from the coworker, and directing the employee to bear a belt.

The coworker's clothing was doubtless inappropriate.  However, the Court cannot conclude that the coworker's self-exposure resulted in a work place so "'permeated' with discriminatory intimidation, ridicule and insult that the Civil Rights laws are implicated."  *Schemansky*, 122 F. Supp. 2d at 777 (E.D. Mich. 2000).  Moreover, the plaintiff herself concedes that her supervisors took remedial action in response to her complaint on this issue.  The plaintiff does not contend or provide any evidence that the coworker continued to expose himself after the plaintiff's complaint and her supervisor's remedial action.  The Court concludes that the plaintiff has not presented a genuine issue of material fact as to her sexual harassment claim.

### D.  Public policy

The plaintiff contends that the defendant's imposition of discipline when she expressed her intention to honor the subpoena for the administrative hearing violated Michigan's Public policy. Defendant Wayne County argues that this Court lacks jurisdiction over the plaintiff's public policy

claim arising from her activities as a union steward because exclusive jurisdiction over such claims is vested in the Michigan Employment Relations Commission pursuant to the Michigan Public Relations Act.  The County also argues that the plaintiff has failed to establish a *prima facie* case of retaliation.

The defendant's first argument misconstrues the plaintiff's claim.  The defendants view the claim as one for retaliation for exercising her rights to engage in union activity.  The plaintiff's actual claim is narrower.  The plaintiff alleges that she was disciplined in response to her refusal to violate the law by failing to honor a subpoena.  The defendant has not presented any authority suggesting that such a claim is preempted by the Public Employment Relations Act; the only case the defendants cite on this issue deals with claims arising out of a strike prohibited by the Public Employment Relations Act and focuses on whether the Public Employee Relations Act intended to vest sole jurisdiction over claims arising out of strikes in the Michigan Employment Relations Commission.  *See Lamphere Schools v. Lamphere Federation of Teachers*, 400 Mich. 104, 113, 252 N.W.2d 818, 822 (1977).  The Court finds that it has jurisdiction to entertain the plaintiff's claim.

Although Michigan law allows termination of an at-will employee for any legal reason or no reason, Michigan "courts recognize an exception to this rule when the grounds for termination violate public policy."  *Morrison v. B. Braun Medical Inc.*, 663 F.3d 251, 256 (6th Cir. 2011) (citing *Suchodolski v. Mich. Consol. Gas Co.*, 412 Mich. 692, 695, 316 N.W.2d 710, 711 (1982)); *see also Hein v. All America Plywood Co., Inc.*, 232 F.3d 482, 486 (6th Cir. 2000) (stating that "[u]nder Michigan law, an employee may have a cause of action against [her] employer when [her] termination is contrary to clearly articulated public policy").  There are three elements to this claim: (1) the "plaintiff engaged in protected activity"; (2) "plaintiff was *discharged*"; and (3) "a causal

-24-

connection exists between the plaintiff's protected activity and the discharge." *Clifford v. Cactus Drilling Corp.*, 419 Mich. 356, 368-69, 353 N.W.2d 469, 474 (1984) (Williams, C.J, dissenting) (emphasis added); *see also Suchodolski*, 412 Mich. at 695-96, 316 N.W.2d at 711-12.

The plaintiff does not argue that her termination was connected to her refusal to stay at work, and she has not cited any authority that lesser forms of discipline satisfy the elements of this cause of action when not connected in some way to termination. She argues only that Norman disciplined her — or at least attempted to discipline her — and participated in a derogatory conversation about her in retaliation for her refusal to disobey the subpoena. In her brief, plaintiff's counsel quotes *Sucholdoski* for the proposition that Michigan courts imply a cause of action for wrongful termination "or discipline" in violation of Michigan's public policy. But that case deals only with wrongful termination; it does not mention the concept of "wrongful discipline." The plaintiff expands the holding of that case beyond the actual language used by the court, and she cites no other case that could support a claim for "wrongful discipline." The plaintiff's public policy claim fails.


### E.  Defamation

The plaintiff's defamation claim against defendant Blair is based on comments made by Blair during a break from a meeting between union and management representatives on December 8, 2010. The defendants advance three arguments in support of dismissal of that count: (1) the alleged defamatory statements were recorded in violation of the federal wiretapping and state eavesdropping statutes and therefore any evidence based on the recording is inadmissible; (2) defendant Blair is entitled to governmental immunity as an executive official; and (3) the statements are protected by qualified privilege.

Although Blair is not entitled to governmental immunity — she was not "[a] judge, a legislator, [or] the elective or highest appointive executive official" in Wayne County, as required by Michigan Compiled Laws § 691.1407(5), see *Am. Transmissions, Inc. v. Attorney General*, 454 Mich. 135, 139, 560 N.W.2d 50, 52 (1997) — the defendants' first argument concerning the illegal recording may have merit.  Both federal and state law prohibit third parties from recording oral communications without authorization.  *See* 18 U.S.C. § 2511(1); Mich. Comp. Laws §§ 750.539c, 750.539d.  Neither improperly intercepted conversations nor "evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court."  18 U.S.C. § 2515.  And "only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment."  *Smoot v. United Transp. Union*, 246 F.3d 633, 649 (6th Cir. 2001) (internal quotation marks and alteration omitted).  However, the Court need not decide that argument, because the defamation claim fails on its merits.

Blair's statements were made during a conversation about the scope of the duties of employees in the plaintiff's position.  The special conference was convened to determine, among other things, whether the Account Clerks would be tasked with carrying checks between the County's buildings in Detroit.  Blair's statements expressed distrust of the plaintiff to handle that task.  Therefore, the defendants contend that the statements were subject to a qualified privilege, and the plaintiff must show actual malice as a consequence.

Under Michigan law, a qualified privilege "extends to all communications made *bona fide* upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, to a person having a corresponding interest or duty. And the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect

-26-

obligation." *Dadd v. Mount Hope Church*, 486 Mich. 857, 860, 780 N.W.2d 763, 766 (2010)

(quoting *Bacon v. Michigan Central R. Co.*, 66 Mich. 166, 170, 33 N.W. 181, 183 (1887)).

Defendant Blair cites *Merritt v. Detroit Memorial Hospital*, 81 Mich. App. 279, 265 N.W.2d 124

(1978) in support of her privilege argument.  In that case, the Michigan Court of Appeals held that

"[a]n employer has a qualified privilege to defame an employee by publishing statements to other

employees whose duties interest them in the subject." *Merritt*, 81 Mich. App. at 285, 265 N.W.2d

at 127.  Such interested employees include "[e]mployees responsible for hiring and firing" and

"supervisors, personnel department representatives, and company officials." *Ibid*.  As the Sixth

Circuit has noted, "[s]upervisory employees frequently have the need, sometimes the duty, to

comment on the behavior and work habits of their charges." *Whiting v. Allstate Ins. Co.*, 433 F.

App'x 395, 398 (6th Cir. 2011) (citing *Beaumont v. Brown*, 401 Mich. 80, 257 N.W.2d 522, 527

(1977); *Cole v. Knoll, Inc.*, 984 F. Supp. 1117, 1134 (W.D. Mich. 1997)).

Blair made her alleged defamatory statements during a caucus break at a meeting between

union and management representatives.  Blair was participating in her capacity as Chief Labor

Relations Analyst.  Two other individuals, Jenilyn Norman and Arif Rasheed, were present when

defendant Blair made the comments.  Those individuals were the department director and deputy

director of Accounts Payable, the department in which the plaintiff worked.  Blair's comments,

therefore, were directed to the plaintiff's supervisors.  The plaintiff's argument that Blair was not

providing legal advice is wide of the mark; the relevant privilege is not attorney-client privilege, but

rather the qualified privilege that arises when an employer comments on the behavior of an

employee to her supervisor.  The qualified privilege applies here because Blair was commenting on

a subject to people who had a mutual interest in the employment duties within that department.

Although Blair's statements are protected by qualified privilege, the plaintiff may overcome that privilege with evidence that Blair's statements were intentionally false or made with reckless disregard for the truth. *Hall v. Pizza Hut of America*, 153 Mich. App. 609, 620, 396 N.W.2d 809, 814 (1986); *see also Prysak v. R.L. Polk Co.*, 193 Mich. App. 1, 15, 483 N.W.2d 629, 636 (1992) (citing *Smith v. Fergan*, 181 Mich. App. 594, 597, 450 N.W.2d 3, 5 (1989) ("A plaintiff may overcome a qualified privilege only by showing that the statement was uttered with actual malice, i.e., with knowledge of its falsity or reckless disregard of the truth.")). The Michigan Court of Appeals defined actual malice this way:

> Reckless disregard for the truth is not established merely by showing that the statements were made with preconceived objectives or insufficient investigation. Furthermore, ill will, spite or even hatred, standing alone, do not amount to actual malice. "Reckless disregard" is not measured by whether a reasonably prudent man would have published or would have investigated before publishing, but by whether the publisher in fact entertained serious doubts concerning the truth of the statements published.

*Ireland v. Edwards*, 230 Mich. App. 607, 622, 584 N.W.2d 632, 640 (1998) (quoting *Grebner v. Runyon*, 132 Mich. App. 327, 332-33, 347 N.W.2d 741, 744 (1984)).

The plaintiff contends that she has demonstrated malice through Blair's deposition testimony that she did not know whether the plaintiff frequented casinos and had not investigated the plaintiff's alleged misrepresentations. There are two problems with the plaintiff's argument. First, some of the alleged defamatory statements are not statements of fact that can be shown to be "false." As the Michigan Court of Appeals has noted, "a statement must be 'provable as false' to be actionable." *Ireland*, 230 Mich. App. at 616, 584 N.W.2d at 637 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 2 (1990)). Moreover, "statements must be viewed in context to determine whether they can reasonably be understood as stating actual facts about the plaintiff" or whether they amount to mere

-28-

"rhetorical hyperbole." *Ireland*, 230 Mich. App. at 618-19, 584 N.W.2d at 638. The plaintiff challenges Blair's statements that the plaintiff would go to the casino or would flush checks down the toilet. The plaintiff does not allege that Blair stated that the plaintiff actually had done these things, which would be a statement provable as false. In context, these statements amount to rhetorical hyperbole that "any reasonable person hearing [the] remarks in context would have clearly understood" as expressions of defendant Blair's opinion that the plaintiff should not be tasked with transporting checks between County-owned buildings. *Ireland*, 230 Mich. App. at 619, 584 N.W.2d at 638. Although Blair's remarks may have been intemperate and inappropriate, the Court concludes that they constituted rhetorical hyperbole and are not actionable.

Second, the plaintiff has not provided sufficient evidence to demonstrate that Blair made the remaining statements with actual malice. Blair said that the plaintiff told people that she was related to Tommy Hearns and that her daughter studied abroad, despite the fact that the plaintiff was not related to Tommy Hearns and her daughter did not study abroad. The plaintiff contends Blair acted with a reckless disregard for the truth because she made those statements without having heard the plaintiff make the representations or investigated the substance of them. However, as discussed above, reckless disregard is not established by showing that a statement was made without sufficient investigation; instead, the plaintiff must provide evidence that Blair "in fact entertained serious doubts concerning the truth of the statements." *Ireland*, 230 Mich. App. at 622, 584 N.W.2d at 640. The plaintiff has not made such a showing. The evidence demonstrates only that Blair was repeating statements that were relayed to her by someone that she "believe[d] to be correct." Defs.' Mot. for Summ. J. Ex. 11 Blair Dep. at 42-43. The plaintiff has offered nothing to counter Blair's deposition testimony or to demonstrate that Blair had any doubt, let alone serious doubts, about the truth of her

statements.  Because the plaintiff has not provided evidence that Blair made her actionable statements with actual malice, the plaintiff's defamation claim fails as a matter of law.

III.

The Court concludes that the plaintiff has not offered evidence that creates fact questions on all the elements of her claims.  The defendants are entitled to judgment in their favor as a matter of law.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment [dkt. #20] is **GRANTED**.

It is further **ORDERED** that the amended complaint is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson

DAVID M. LAWSON
United States District Judge

Dated:   February 19, 2013

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 19, 2013.

s/Deborah R. Tofil
DEBORAH R. TOFIL

-30-